Secretary, U.S. Department of Health and Human Services et al, At Balance. Mr. DeSantos for the At Balance, Ms. Patterson for the Appellee. Good morning. May it please the Court, Josh DeSantos on behalf of the Indian Health Service. The Indian Self-Determination Act allows tribes to take on the responsibility for their own health care and to take over programs that IHS runs for their benefit. The point of the Act in this context is to give tribes greater agency over the provision of their health care. So whereas by default the tribe gets the health care from the federal government through IHS, the Act allows a tribe to exercise agency and then provide health care services for itself. The issue in this case arises from the fact that IHS often provides services for more than one tribe through the same program in order to conserve resources. Congress foresaw that circumstance, which is very common, and it dealt with it in the following way. It expressly prohibited tribes from taking over a program in which more than one tribe has a share unless the other tribes consent, which makes sense given that the Act is about self-determination and agency and if one tribe could take over a multi-tribe program without the other tribes having a say in the matter, that would eliminate the other tribe's right to self-determination without their consent. And then second, Congress gave IHS authority to sever and redesign a program that served more than one tribe so that it could accommodate all of the tribes that are affected. That's a common-sense approach to the issue here, and the district court's ruling contravenes those principles. What the district court said was when there's a multi-tribe program, the first tribe to ask to take it over gets all of the money, not just its share, and that would effectively deprive the other tribes of the opportunity to provide for their own health care. Can you just help me out? There's a steep learning curve on this case for me. How do you define tribal share in this case? Tribal share is a long-standing concept. It means the portion of appropriated funds that IHS allocates on a per-tribe basis to each tribe for their benefit. The way it works is, as the Supreme Court has previously talked about and acknowledged in both Lincoln v. Vigil and then again in Salazar v. Raymond Navajo, IHS receives lump-sum appropriations, and in consultation with the tribes about their needs, it then allocates those funds on a per-tribe basis. The way it seemed to be described here, and I may have totally misunderstood this, was it was this large number. It was $190,000 or something like that for the Winnemucca tribe. Was that just a lump sum that was for all their health care needs? Or they get a bigger sum than that, and that was the amount that was dedicated to the clinic program? There are different buckets of funds. The one at issue here is hospital and clinics funds, direct medical services. For direct medical services, IHS applies a long-standing formula to all the tribes in the region. The Winnemucca share was $190,000 under that formula. That was all going into this clinic, even though they were getting a lot of their... This is one thing that just confused me, and you're the expert. As I read the record, they were getting almost all of their, I think I would call it direct medical care, but maybe that's my error, through a different process. It sounded like just a direct reimbursement, provider reimbursement process or something like that. Not at this clinic. You know the record. There's two people, two people, maybe six people. Was that included in their agency share, or was that dealt with separately? Am I wrong to say they're both the same? That is dealt with separately, so that's what's called purchase and referred care, and that's a separate bucket where IHS pays third parties to provide care, but it's different from direct medical services. Why was Winnemucca, why did it have so much money attributed to this clinic when there were so few members using it? I think the record says that 25 or 50 other tribes would have people who would show up now and then, just because I take it the clinic would be open to other people who come in, so you don't have to show tribal membership to get in the door. The Winnemucca just seem to be much like them, just a few people a year now and then, so why is it that they had this large share but none of these other tribes that were also using the clinic did? Why $190,000 for two people? I think what would clarify this for your honor is that shares are not allocated based on how many people end up using a particular clinic. They're allocated based on how many eligible potential users live in the geographic area that's assigned to each tribe. What happened here was IHS used that formula, taking into account how many eligible potential users live in the Winnemucca's area, and allocated shares accordingly. At the time, the Winnemucca tribe did not have a functioning government, and you can see in the record, page 244, there were several factions that were vying to be the Winnemucca's government, so IHS couldn't consult and get a determination as to where Winnemucca would prefer its $190,000 to go. My understanding is that because they didn't have a functioning government, IHS or the secretary, I'm not sure exactly the level, was making the decisions for Winnemucca as to where those funds should go. Well, IHS always makes the decision. It's in consultation with the tribe, but it always makes the decision, and I do want to highlight the point that your honor made about the fact that clinics are open to members of all tribes. I think that's an important point to keep in mind because it shows that allocations, the shares don't depend upon how many members of a particular tribe use the clinic. It's not the case that if several members of a different tribe come and use the clinic, now that tribe acquires a share. The shares are determined by IHS under a longstanding formula that isn't challenged here. But in the operation of the clinic, I take it Fort McDermott has been operating the clinic now for a few years? That's my understanding, yes. Right. They would still service however many Winnemucca people, members of the Winnemucca tribe. I'm speaking too quickly. Came into the clinic, they would still provide them medical services just as they had before? Or would that change with the share withdrawn? No, that's correct. Tribes are required to provide care to anyone who comes through the door. But the point is that if the Fort McDermott tribe takes the Winnemucca's funding share of direct medical services, then there is no money available for a program that the Winnemucca tribe could take over. So in other words, But until they do, it seemed to be what Interior was doing before, or the BIA was doing before, was you said it's your decision. It's not really Winnemucca's because they didn't have a government, a functioning government to make a self-determination decision at the time of your final response, your response to their final offer. And so it was your decision where this money should go. And nothing on the ground changed. They were going to keep serving these same individuals, I assume, until today. As of today, we still continue to serve these same individuals, even though now the Winnemucca have a functioning government. So let me clarify. The things on the ground would not stay the same because the Winnemucca would have no opportunity to exercise its right of self-determination under the act. And in fact, IHS could not take the money away from the Winnemucca and did not have to for the following reason. Like at the time of your final response letter? Yes. I just said that Interior makes the decision and you just consult with the tribe. That's right. But Congress specifically said that a tribe can't take over a multi-tribe program without the other tribe's consent. And because as it stood at the time, Winnemucca had a share here. Well, how do we know this was a multi-tribe program? What is that? I don't know how we know. Some of those it looks like consortiums where the tribes themselves actually get together and take over a service from IHS or BIA generally, I guess, other types of services. But here it was being run by IHS. So how was it a multi-tribe program when it was run by IHS? Just because you allocated the funds there? It's because IHS allocates funding shares for particular programs on a per-tribe basis. And you can see how Congress acknowledges this in the statute. In Section 5324I.1, it says in particular, sometimes a contract will, quote, require the secretary to divide the administration of a program that has previously been administered for the benefit of a greater number of tribes. You see it also in the fact that in the funding provisions in Title V. But you're not dividing anything. I don't get what was divided here. They're still providing exactly, I mean, maybe they've improved it, but for our purposes, the exact same health services accessible to Winnemucca tribal members as they would have before. So it wasn't as though Interior divided anything up. I mean, if it had said, fine, you can run it, Winnemucca will not go there anymore. It will just be your clinic, that would make more sense. But what division was made here in the program? What division in the program was made as opposed to behind-the-scenes funding allocations? The division is the funding allocation in this case. The tribe now has only- Did you talk about dividing a program? Divide the administration of a program. That's a provision you just pointed me to. It doesn't say divide funding. You have to divide the administration of a program, which makes sense if two tribes were both taking over different parts or if a tribe was taking over one part and Interior was going to keep operating its own part. But the program here, I don't- how was it divided? How was the program here, the clinic? We'll call the clinic the program. How was it divided? Let me explain how it works. You have a program that's supposed to benefit multiple tribes because IHS allocated funding shares for multiple tribes. One tribe comes to the door and asks to take over the program. The way in which the tribe gets to administer the program is negotiated. Maybe they want to run it in exactly the same way. But the point is, they can't take everything because another tribe has a stake here. And so IHS says, here's what you could take. Sometimes it's including the building and it's going to use the other tribe's share in a different way. Sometimes there's more line drawing to be made. But in this case, what happened is IHS said, you know, fine, you could take the building, run it if you want to run it the same way it was being run. But the portion that the Winnemucca had here, funding, we're going to use for them once they tell us, you know, how they want to use it. Again, you pointed me to the statutory text here. And what you're talking about is we're going to divvy up the funding now. We had been giving you two sources of funding. Now you're going to get one. I think I'm, am I correct in reading the record that while it served a lot of other tribes, none of them had funding allocated, right? It was only, right. Is that right? Okay. At least that's to the clinic. I don't want to buddy a mess. But the statute says divide the administration of a program. And it doesn't say divide the funding. That's why I'm confused. Well, let me point you to Section 5388, as well as Section 5325A1. 5388. One at a time. Okay. Yes. If you look at Section 5388C and multiple other places in Title V, it talks about the funding that a tribe gets as its tribal share, which is referring to this very same concept. If you look at. You're in which, in C? 5388C. That's right. That's this concept that we're talking about. When you look at 5325A1, it explicitly refers to the fact that funding might be for only a portion of the program. So Congress knew that IHS. Wait, there's nothing. I'm not seeing that in. I'm not seeing it in 5388C. Am I missing tribal share? You said tribal share is in here? That just refers me to 5325A1. And contract support costs. So, 53. I'm sorry if I'm not seeing it. You said 5388C, right? I did. One second. I believe if you look at. Sorry, it's 5385B and 5388D. So, 5388D refers to the full share of a tribe. 5385. You see 5385 funding agreements. So, if you look at 5385B and 5385D, it's section B1. I'm sorry, we've got to go a little bit more slowly because 50D is pretty complicated. I'm not quite sure this is clear as you might want. What was the second one you said? So, the point of D is that it refers to the full share. 5385. It does use the phrase full share, but I'm not sure where that gets you. If you look at 5385B, when it's talking about funding agreements, how much. I've got to switch to a lot of things here. Okay. Okay. Again, it says receive full tribal share funding. Then Congress defined tribal share as the portion that a tribe has in the program. And let me. Where's the definition? 81? Is that the one you're talking about? That's right. 38188. Right, but that's got the portions thereof. And the portions in 5325A1, again, is talking about program, portion of the program, not portions of funding. So, I just find this really confusing. And alas, this is an area where you get Chevron deference, unfortunately. That would help a lot, but you don't. So, let me try to clarify something about the program. When a tribe is negotiating to take over a program, there's sort of flexibility into how the tribe is going to run it, whether it's going to run it in exactly the same way or not. So, here the tribe could say, we want to run it just like you were running it. And if we can only, like say there was no dispute here and they agreed, the Winnemucca has a share that we can't take over. They could say, we want to run it just like you were running it and just take away the funding that went to Winnemucca and Winnemucca can do, you know, whatever it wants with it. It could do that. So, IHS could give it the building, they could run it the same way, just with. Could IHS do that if it would imperil access to health care for another tribe that doesn't have, at least at the time, the wherewithal to take over its own health care? Or it would be quite expensive then for IHS to open up another clinic, you know, a couple miles down the road? Well, because IHS has other options, but that's the. I'm just trying to say, IHS could approve something in that situation like that? I would think there would be some breaks within IHS on that in a situation like that. So, I take your Honor's question to be when IHS has a program where multiple tribes have a share and one tribe wants to take over its share, but IHS couldn't really provide health care services with the remaining share for the other tribe? Is that what you're suggesting? But the tribe that is taking over, you just keep saying taking over a share, what they're taking over here is a program, the clinic, okay? And they're taking over the full clinic and they're continuing to provide services to the Winnemucca tribe exactly as they had before. Nothing has changed in the real world. What has changed is the Winnemucca wouldn't be able to take over anything. It wouldn't be able to exercise self-determination. But they couldn't anyhow at the time of your decision? But now they can. I mean, they have a government now. Okay, but at the time of your decision, you were the one making that call, not the Winnemucca tribe. And so that's why it seems odd that the secretary said, we'll have our cake and eat it too. We'll get the exact same clinic. We'll continue to ensure that the Winnemucca get just as much services at that clinic as they did before. And budgets are always tight. Now we're going to take away that $190,000 that was dedicated to two people. It's not that it was dedicated to two people. It's that it was dedicated to a tribe on the same basis that every other tribe got money. Okay, but on the ground, it was taking care of two people, which... But that was... What I want to emphasize is that was due to the happenstance of the moment that Winnemucca couldn't advise as to where it would have preferred it. Going forward, what this means is every other tribe in the region has a certain amount of money based on a formula that applied equally that allows it to take over direct services under the act. Winnemucca will not. And the Fort McDermott tribe will have a greater share than everybody else. That's what's going to happen on the ground. And as to the program issue, IHS has authority to redesign. It could leave it looking just how it was and say, in order to meet the needs of the other tribe, we're just going to leave you the clinic and meet the needs of the other tribe another way, which is what it did here. Is it unusual? I'm sorry, go ahead. How would it do that? So with the amount of money, it could either start another program. It could dedicate it to buy more third party services, which is what it has been doing. My understanding is. In the years after this. The status quo. Status quo ante, like pre self determination act. Is that the Indian health service would be operating this entire clinic. And for the benefit of mostly the Fort McDermott, but also the Winnemucca and whoever else uses it. Right. And let's say it costs them. A million dollars to. Perform all of those operations for all of those tribal members. Right now, the Fort McDermott come in. And. They want to take over. All of those operations and 53 25 tells us. That they should get the amount the secretary would have paid. To operate all of those programs, which is. All of the services for all of the people who use that clinic. That's what's happening. And. 53 25 says they're entitled to that full million dollars, right? There's no IHS is not running part of this clinic. Nor are the Winnemucca running part of this clinic. Let me, let me back up and sort of. Explain further how, how this works. IHS says, here's how much money I'm going to allocate for the Fort McDermott tribe to meet its needs. Here's how much money I'm going to add, allocate for the Winnemucca tribe to meet its needs. I'm going to put that money into this program to meet both of their needs. When the Fort McDermott tribe asked to take over the program. 53 25. Foresees that sometimes it's going to only be able to take over a portion of it, right? Fort McDermott tribe comes to the door and says, I want to take over the program. IHS says, well, some of that money was supposed to be going for Winnemucca. And if we give you all of it without Winnemucca's consent, it would violate the statutes and Winnemucca would have no ability to then take over anything and exercise its right to self-determination. So on the ground, what you're, what plaintiffs principally point to is the fact that the allocation that IHS made for Winnemucca did not end up benefiting Winnemucca members on the ground very much. But the answer to that is not to take the Winnemucca's share away. The answer to that is to let the Winnemucca, now that they have a government say how they would prefer this to go. I mean, this scheme is not a use it or lose it scheme. And it's not one where a tribe acquires other funding allocated by an agency to a different tribe through adverse possession of some kind. And Congress explicitly said in two places that a self-determination contract request does not require the agency to take money away from one tribe and give it to another. Can I ask a follow up? You said that you've actually been using this fund, these funds now to provide more, I've got the terminology or direct services to the Winnemucca tribe since all this happened or what it was, the PRCs or whatever you call them. The way it's, the way it's worked is, sorry, IHS has ended up buying more PRC. In other words, the one that IHS pays third parties to provide services. But let me just emphasize that those are different from direct services in several ways. One is that the tribe can't sort of take it over to operate it itself because it's a third party providing it. The other is that these funds are supposed to be more of a backstop in cases where a tribe like can't get services elsewhere. The tribe is usually supposed to request IHS authorization before it even gets the care. Sorry that the person who wants care is usually supposed to request authorization from IHS. There are all sorts of requirements. I guess that's different. I was, that's helpful to think about, but I was curious because you said that's what you've been doing. So you've been doing, you've increased that since, I don't know, one of the years, but since, since events, since, since the rejection letter by IHS, but there's an injunction in this case that wasn't stayed as best I can tell. So I had thought that at least as the litigation progressed, Fort McDermott was getting the funding ordered in the district courts injunction. Is that right? No, Your Honor. The tribe has been getting the funding that IHS approved as like as a matter of the severance. So it's gotten everything that IHS said is your portion. But wait, there's an injunction in this case from the district court. Is there not that you're saying that they were to get their requested amount? Right. So I believe that the district court said they, they should, but it did not state it did not say the date certain and there's no indication that it didn't intend for IHS to be able to appeal. I'm sorry. I'm incredibly confused. I thought the tribe comes in and makes an offer. The government can reject it. They challenged that rejection. The district court said you win in a final judgment. We're not here on a PI appeal and the final judgment you win Fort McDermott and you have an injunction for the amount that you said you needed, but the government just hasn't been given it to them. Well, again, Your Honor, the district court didn't say, turn it over immediately didn't provide a date certain. How many years has that injunction been in effect now? And you didn't ask for it. It was 2019. It was a couple, it was like October. So a year, an injunction, you don't have to comply for it with an injunction for a year, two years. I'm very confused. I had assumed you were complying with the injunction pending litigation. You didn't ask for a stay, but my understanding. No, you're ignoring its injunction. My understanding is that IHS gave the tribe, the portions that were approved, which 53 87 says it should do. And the district court didn't say do it immediately. And the Fort McDermott tribe has not, I think both parties understood this to mean IHS could still seek an appeal. There was no date certain. I'm just, okay. I'm just, I'm very surprised. I thought, you know, people, of course, people can appeal when there's an injunction in place, but you either, you either comply or you stay it. Apparently I hadn't realized that ignoring it was another option. Okay. Mr. I have a, just a technical question about the rejection letter. Sure. Which I'm asking because as I understand this statutory scheme, we, it's a two stage process here, right? The first question is, did the service properly raise the issue in the rejection letter? And if it did, then you get them to the merits, right? So my question about the rejection letter is what in that letter says that the clinic had been funded with money allocated to the Winnemucca and that the Winnemucca had a portion of the clinic. Your Honor. Because it isn't fair. And I'd like you to point me to the precise language because if it isn't there, then, then, then there's, then if it isn't there, then I don't understand how the rejection letter provides what the statute calls specific findings. Your Honor, if you look on page 123 of the joint appendix, Are you looking at the rejection letter? Right. Which is the rejection letter. IHS says, IHS has determined that the tribe's share of hospital and clinic funds is, you know, a certain amount minus retained services, comma as reflected in the exhibit. Should Winnemucca authorize the tribe to carry out, you know, the services on Winnemucca's behalf, an additional 190,000 would be made available. To date, the Winnemucca has not authorized the tribe to carry out services on its behalf. The IHS therefore rejects the tribe's proposal. IHS is clear and you also have multiple instances in the record such as, you know, JA 40 to 41. And then the closure report that was attached to the rejection letter stating that Winnemucca tribe has a share. IHS is clear. Winnemucca has a share, Fort McDermott can only take its share. That provides what the statute requires, which is, you know, a reason with the controlling legal authority, which it cites here, 5381. Okay. Judge, Judge Kansas, do you have any further questions? I had one more. I just want to make sure you were done with your questioning. Yeah. Let's go back. You said they couldn't get these funds without the consent of the Winnemucca tribe. And at the time my understanding is because there's no functioning government, IHS or someone in interior was making those decisions. For the tribe. Is that, is that how it works when you have a tribe with no functioning government? When you have a tribe with no functioning government, the tribe can't consent to another tribe taking over. Can the interior make that decision for it? No. So it's not the case. Let me, let me try to explain. IHS always makes allocation decisions. It just consults with tribes, but when it's the case that one tribe wants to take over another's share, Congress requires a resolution by the other tribe. IHS can't substitute for that resolution. And Congress requires that resolution. Is that, that's one of the ones you pointed me to? Yes. So in 5381 C1B, which are the eligibility, one of the eligibility provisions under title five, I'll repeat that more slowly. Sorry. 5381 C1B. And then 5304. I apologize. I don't have a C in 5381. Got an A and a B. There's a definition of tribal share, but none. Where it says there has to be a resolution from the tribe. And so if there's no functioning government. Oh, sorry. 5383 C. There's a lot here. C1B states that it needs resolution of every, of the governing body of each Indian tribe to be served. Wait, hang on a second. Okay. So this is defined in the qualified applicant pool for those to seek self-governance. Self-governance. What does tribe to be served means? That doesn't mean that it has a tribal share because there are a lot of tribes. I'm sorry. Is it 25 or 50 tribes that receive services at this clinic? How do I know what to be served means? I'm sorry. It doesn't mean. It means. It can't mean anyone who comes to the door because obviously you don't know who's going to come through the door. What is referring to is exactly what we've been talking about, which is. I know that's what to be served means. Well, that's that, for example, if you look at 53. Let me just double check that it does say this. Unless I'm thinking of a different one. This is, it's just really confusing.  I'm sorry. I know. There's not, if there were like a nice direct provision that would say what you're saying and the language just keeps changing. So I'm not. How the definition of applicant pool. And there's no doubt that the Fort McDermott meets the qualifications to have sought. Not a self-governance compact. So there it uses the phrase to be served in 53 or four. And there it uses the phrase services benefiting more than one Indian tribe. That's 53 or four L. So Congress didn't use like the same phrases. But it means the same thing. It's not saying that. Every single potential Indian tribal tribe that might be served at the clinic. So I thought I had thought I had read this as thinking that. Fort McDermott has to have a formal resolution to seek self-governance. The tribe. No. I don't know. It can't be to be served either. Right. There's so many being served in this situation. Right. That's that's why that's referring to other tribes over the stake in the program. How do I know that? That's what I'm because that's. For the reason that you're suggesting, which is can't mean anybody who might possibly can't mean in this case, but I think, I think this case is unusual. Usually you don't have 50 tribes using. I don't know. I don't know. That isn't unusual in every case. Unusual in this case. Okay. I misunderstood. Okay. I just always requires the tribes provide healthcare to anyone. I'm sorry. Is there a legal requirement that. Any clinic, even if the clinic is dedicated to the local tribe. I'm sorry. Even if the clinic is dedicated to the local tribe. Any. A member of any tribe can go in and get services. There might be. I know that I just requires it. But I don't know off the top of my head, whether that's in section requires it in the funding contract. Right. Okay. Okay. Did, did four McDermott. Requests. Participation in a self-governance compact by resolution and. Just some part of interior. I'm sorry. Did they to, to, to, to, to put the, get the ball rolling here on this whole process to take over the clinic. They must've. Had to request. I'm sorry. Did they have to request. Becoming participation in self-governance compact. By resolution or other official action of their government of their governing body. I don't know whether the actual tribe that's requesting to take over does a resolution. Really interior is not going to read. Tribal government. Of course they are. They do. I don't, what I'm, what I'm trying to say is I don't know whether that's. You know,  clinic is going to do that. You know, formally. It most likely is. I think that's what. One B says they have to do. This is talking about the tribe. The ones that are in the applicant pool. This is the one that's applying. This refers to the one that's applying and you're going to make sure. That the tribe has official resolution. You have to have official resolution. You're probably right. I'll just. You're probably right. But let me, he doesn't help you at all. No, it definitely does. I think that means that's the part of the tribe that's taking over this participating in the self-governance. Well, so. Look at the 5,304 L and the proviso that was added there. Let me try again. Slow down again. Okay. Yeah. For L. Okay. All right. You look at the proviso at the end. It says provided that in any case where a contract is letter grant made To an organization to perform services. Benefiting more than one Indian tribe. The approval of each such Indian tribe. Shall be a prerequisite. So there. That's not giving them there. That's not an approval to give over the share. That's just approval. Approval to have someone contract to provide their services. That's right. And now if you put that together with the certain severance provisions, that means. Yeah, I don't know. Can't take over the program in its entirety because it's benefiting. Okay. But when a Mucka didn't, did anyone ask when I'm like, if it's okay. Not to get their tribal share. Do they mind getting services from that's a different question. Are you okay? Provided by Fort McDermott rather than when a Mucka that's how I read this. Well, so that's. You're right, but you have to, you have to combine the provisions. So here's, so here's how it works. So here's how it works. Fort McDermott needs the consent of. The Winnemucca to take it over under 5304 L. That was a provisor of Congress added after testimony about the fact that it would create lots of problems. If tribes could take over programs that other tribes benefit. Services. This gets me back to my same question. What does it mean to be services benefiting? More than one Indian tribes. So not just for McDermott. It's for all tribes.   It's for all tribes. It's different. Like we were talking about under the applicant pool. So to perform services benefiting more than one Indian tribe. That means. Benefiting them means taking your share as opposed to providing medical services to you. So. You have to read this in the context of IHS allocating funds to, to Indian tribes. For decades. What it means is when a program is supposed to be serving more than one tribe. Then you, a tribe can't. Take it over without in its entirety. Without the consent of the other. But then the severance provision say that when a tribe. Can't. Take over something. It can't completely take over. IHS has to approve. The portion that it can take over. That's what I just did here. You're requesting to take over a clinic. That also serves Winnemucca. Winnemucca has not consented. Here's the portion. The verbs that are confusing me. It's more than it serves. Dozens of tribes. It serves anyone who walks in the door. I guess anyone who's a tribal member, but right. So this language is not referring to. You have to get the authorization of any tribe that might walk through the door. Because that's impossible. What it's saying. It's referring to IHS practice of allocating. Okay. Thank you. Thanks. Very confusing, but thank you. Thank you for. Thank you. We'll hear from the, sir. From the plaintiffs. Thank you. Thank you. Thank you. Thank you. Mr. Mr. Patterson. Thank you. And may it please the court. I'm Rebecca Patterson. For the Fort McDermott. Hi and Shoshone tribe. With all due respect, what government council just told you is filled with legal and factual inaccuracies. So I'm going to do my best to try to clear things up. First of all, there's been no longstanding formula or no decades. I just providing services to the Winnemucca tribe through the Fort McDermott clinic. What there has been decades of is IHS serving the Winnemucca tribe. And I just paid for medical mock-up. Excuse me, Winnemucca tribal members to receive services at private non-tribal providers. And they pay for that care. And this makes sense. And you need to understand a little bit about the geography of the region. Winnemucca is a city that is 20 times bigger than McDermott. It has a hospital that serves the entire region. It has several. Health care providers. McDermott is a teeny tiny reservation that if you blink, you will miss it. I actually did. I was in Oregon when I first went out there, I had to turn back around. And so, and it's an hour and a half from Winnemucca in the wrong direction, as in not towards Reno, the, the big, big city, but in the wrong direction on a road that is barely impassable in inclement weather. So. It did not make sense for IHS to serve Winnemucca tribes through this small clinic and hour and a half in the wrong direction. It made sense for them for the few people that needed services to just pay for them to see private healthcare providers. What you have here is the sure service unit that serves 13 tribes. I just, and it's discretion decided how it was going to serve those tribes. Some tribes have clinics. Some McDermott, they actually call it a health station. Cause it's fairly small, but the Walker river tribe has a clinic. The pyramid lake tribe has a clinic. The Reno sparks tribe has a clinic. Some of these tribes have always just been for, been served primarily by a purchase and referred care health program, such as the Winnemucca tribe. When a tribe comes into compact or contract, they get the funds for, however, I just had determined to serve them. So when the McDermott tribe comes into contract, they get all the resources that was going towards the clinic. That's serving them. The Winnemucca tribe can still exercise their self-determined dirt determination rights. When they come in, if they come in, if they choose to contract, they would get the resources for the purchased and referred care program that IHS has always run for their benefit. Now those resources are not in any of these tables on the record. Why? Because when Fort McDermott was contracting, we only requested resources that were relevant to the Fort McDermott program. We weren't asking about the money for Winnemucca. And government council even said that those funds are dealt with separately. There's a whole nother budget. There's a whole nother bucket of funding at the service unit that funds that purchase and referred care program. What happened here is that when the tribe came into contract, all of a sudden I just said, well, yeah, they've admitted. We've been using those funds at the McDermott clinic for the benefit. You just broke up. Could you just repeat that sentence once more? Sure. You just broke up. You said when the tribe came under contract, what was the rest of your sentence? When the tribe came into contract here, I just admitted that all these funds were being used at the Fort McDermott clinic. But then they said we need to cut some of those funds off the top to allocate to Winnemucca. It doesn't matter. It's divorce from what they were actually doing. It's it's entirely a budgeting exercise. And that is contrary to the statute, which is very. As a budgeting exercise. Do you dispute that? Those are funds that are budgeted for. The Winnemucca tribe. $190,000 was budgeted for the Winnemucca tribes healthcare. In some form or another. I don't even think that's clear from the record. First of all, I don't think that's clear from the record.     I don't know what else that would mean. Before 2013 this, this tribe. We have charts and say, when I'm like a tribe share $190,000. So. I don't know what else that would mean other than that. Those were funds that were budgeted. Maybe. Maybe it was a bad allocation decision. I don't know why they have an extra $190,000. And they can. You know, put in here for, even though they know, I guess they're doing the head count, but they know nobody's going to come down and use it, why they don't reallocate it. But that's, that's in their wheelhouse, but I don't think there's, I didn't think there was any factual dispute. It was 191,000 had been. Budgeted for healthcare. For the Winnemucca tribal members. They just hadn't been using it. Right. Well, The reason I say there's a factual dispute is because the 190,000 had been different numbers, but, but I will. Some number in that there's some number. There is some number that dollars that you want that had budgeted to Winnemucca tribes healthcare. Correct. And our position is it doesn't matter how much they budgeted. It could be 190,000. It could be 500,000. It could be 300,000 because the budget doesn't matter. What matters are their actual expenditures. That's that's clear from the statute. That's clear from Congress who, when they were amending the act and they've come back to amend this act. I don't think anything is clear in the statute. I'm sorry. It doesn't. It's very clear at all. So Congress said one of the reasons they needed to amend the statute is because. It was quote unquote, hard to correlate projected budgets with actual expenditures. And courts that have looked at this issue have looked at 53 25. Congress say that. They said that in the 1987 Senate report. I think it's Senate report. I'm sorry. Senate report. 100. Five 74. Assuming that's in your brief, right? I know you were talking about the reasons they did these amendments. Yes. Okay. And I can find you the exact page site in a second. That's okay. Don't waste your time. So. Statute that says that is our problem. I'm sorry. The statute says you get what the secretary was. No less, excuse me. The study says you get no less than what the secretary was otherwise providing. And every court that has looked at that has said that what that means is their actual expenditures. What were they spending at that clinic? You see that both in this circuit cases in the Navajo nation. They also says what were portions thereof. What does that mean? That's because a tribe doesn't need to contract for every program. So in this instance, for example, Fort McDermott could have come in and said, we want to take over only diabetes. And we want you, I just to keep running dental and medical and substance abuse programs. And so they can take over just that portion. They actually. Of the program, not portions of the funding. Right. Portions of the program. I'm sorry.  I'm sorry. Isn't the answer to this question. In the stipulation. The stipulation between the party says that. The 600,000, $600,000 is what this is. What. Is what was spent. Was. They were the actual. 2015 expenditures. And that's where the tribe based its proposal off of. And that's a joint appendix to 31. Just for anyone else who's following. Right. The stipulation between the parties. Correct. Correct. And so HHS agrees that during the year that determines the amount of money. That the tribe will get under its contract is $600,000. Right. Okay. Sorry. Sorry. Yes. I thought it was 555. Oh, no. I'm a little confused. I don't see 600,000 on page 231. I see a projected expenditure. Of 603. Is that the number we're talking about? Yeah, that's the number we're talking about. Right. So just to clarify the, the. The projected expenditure for 2016 was 603, eight, four, two. Which is based on the actual FYI, 2015 expenditures, because at the time of negotiation. Okay. What I just asked. They agreed with this. This is their stipulation. Right. Okay. Do we have an actual number for 2016? You have so many charts here. Well, that's part of the problem. The record here is a bit of a mess. But you do have the 28 in 2018, the agency put together a whole new table of what they actually spent in 2016. That is a joint appendix. Okay. So I'm going to go back to the joint appendix. I believe. And give me a second. I can double check that page. Excuse me, joint appendix to 38. And that table shows that in 2016, they were spending nearly a million dollars at the clinic. They also paid the full funding amount. The 502,002 pyramid Lake. As a result of the. And that's not an issue in this case. Right. We're only talking about the 600. In this case, correct. Well, It's all somewhat at issue because the agency combined the two and said for both programs, you get 555. So if you put aside the EMS program, all they awarded, the tribe was $53,000 to run the clinic. Even though. I'm sorry. I'm. I'm confusing on two 38. There's an awful lot of numbers. And I don't see which paragraph are you talking about on two 38? Did you say J two 38? I mishear you. Excuse me. It's during appendix two 39 is the table. Okay. Alrighty. Okay. And this is. What they actually spent in 2016. And this was put together after the fact. Correct. According to the agency. This was put together after the fact. Where's your number. Which number. I'm sorry. The number I was pointing to is in that bottom right corner. It's 982,000. 6, 6, 3.1. Four. This is, this is. Personal con personnel compensation, travel, transportation, rent, communications, utilities, contractual services, supplies and material. Equipment. Right. I can't be the clinic. There has to be medical care. There's no medical care on this list. Well, there's no salaries on this list. I don't get it. I don't understand what this list is. I guess personal compensation compensation is that all the salaries. Correct. And if you look at the grand total, that's what they were spending at the clinic. They were also spending the 502,000 on the EMS program. So their own data suggests they were actually spending. 1.5 million that year. I'm sorry. We are only asking for 1.1 here. But I will also add that this is part of the problem because the aid, the statute is very clear on the agency's burden here. The agency has a burden to clearly. The agency has a burden to clearly demonstrate their specific findings for declining the letter. Not with tables that they added two years after the fact, but within the 45 day statutory window, the government had a burden here and they simply did not meet it. So can I just, again, I'm just. Kind of so confusing because you have that chart and then you have. On two 36. You have a, for FYI 2017. You have 686,000. And then there's another FYI, 27 for hospitals and clinics, which I thought is the category at issue here. And then you have on two 34, another one that says FYI, 2017 hospitals and clinics, 555,000. So it just feels like there's numbers all over the place. And so I don't know whether it's 900 or 600 or 500. And that was the agency's burden to explain that. And they clearly did not do that here. What was also your burden to say how much your show don't, don't you have to show that you're asking for your argument here is you, you were asking for what they were spending. Right. And. Which of these numbers is what you were asking for, that they were spending. I thought it was more like the 600,000, then you add up the 500,000 from EMS and that's how you got to like your 1.1 number or something like that. Exactly. So. You're not asking for this 980, something that you've just asked to talk to us about. No, the tribe was, was basing off of the data. They were provided at the time. All of these charts were provided. After. So at the data provided at the time, the last full year of data we had was for FYI 15, the chart produced by the agency, which is. Okay. So we said, okay, that's our last year of expenditures. We'll add the six Oh three. And then we added the EMS amount. That's how you got to the 1.1. And that was agreed to by stipulation again, in that joint appendix, page two 31 paragraph 12. Is it right by the way? They haven't been spent giving you the money from the injunction. Cause. That's correct. They actually haven't even added the employee housing services provision in the first summary judgment below that the agency is no longer appealing. They issue an amended funding agreement by December 1st, 2016. They didn't. Okay. I'm sorry. The order specifically orders that. They have not done. So. You haven't gone back to the district court and said. Okay. Well, that's your choice, I guess. Okay. I want to follow up. Can I, I want to follow up what you said about the rejection letter. You said they didn't make their case in the rejection that I asked Mr. DeSantis that question. Yeah. I think that was in the letter. Specifically, and he referred to a couple of sentences. In the letter. What did you, what's your response to his response to my question? Those couple of sentences in the letter again, we're on joint appendix. 123. Just says it just reflects shares Aleppo to win a Maca. But it doesn't. That's again, that's the same budgeting argument, the same argument they raised in pyramid Lake, the same argument. What does it, what does it, it show that it should. Under the statute. It should show it's the amount they budgeted. What should it show? To have. Properly raise this issue in the rejection letter. It should show that they're actually expending these funds for services for the benefit of the Winnemucca tribe. And the record does. In the last year in the last year. In the last year, even in the last three years. And. Language, the language. I don't have the language. The language he cited is just budgeting. It's not actual expenditures. Is that your point? Yes. They also, they also say they also make their argument about you're taking shares allocable to win a Maca. In that same paragraph. That's their whole argument. And that's their whole argument. And that's their whole argument. And you exceed the tribe's applicable share of IHS programs. The table shows you are taking shares belonging to other tribes. Your number. It also reflects shares allocable to the Winnemucca. So I don't understand. Your argument that they didn't raise this point. I'm not contesting that they didn't make their budgeting point. We just think that. Well, they also making their shares. You're taking tribal shares. They make that argument too. And the staff. Right. But there that's not at all supported by the record that when a Maka has any shares in the McDermott clinic. And that's what they don't explain. How does a clinic that is not serving when a Maka, when you have a, a tribe that is served by entirely separate purchase and referred care program. How does that mean that you then. You know, you're not going to be able to provide services to other tribes that you are also serving them through this clinic, which you're still not doing in the, in the divisibility. Provisions that Mr. Dos Santos. Was citing to what you actually see is IHS actually providing services in that facility and continuing to do so. So for example, in another service unit of the IHS that would serve three tribes, they would provide services to the third tribe. And that's what it looks like when you have a program benefiting multiple tribes. In this case, if this really was benefiting, when a Maka, when the tribe came into contract. Is it. Was summary judgment judgment inappropriate here because the facts are just a wreck. We don't know amounts. You're disputing whether there actually were, were not allocable chairs. Summary judgment was appropriate because the agency has a burden to me and they did not need it. The parties do not disagree on, you know, we had a spreadsheet that said this number or a spreadsheet that said that number or, or what the parties actually stipulated to, to facts of what was in front of the court. But the agency has to make specific findings. And the reason that the court is struggling is because the record is a mess. They did not make specific findings here. They did not, they did not clearly demonstrate why they're chosen ground for rejection. And it has to be one of the, what were they supposed to say when they say this reflects shares allocable to win a Maka. The tribe's share was they have the hundred and 90, 190,197. What more are they supposed to do? They're supposed to explain that the McDermott clinic is providing services for the benefit of Winnemucca tribe. And not just, not just a funding share, not just a budget, but what services are they providing there for the Winnemucca tribe, that the McDermott tribe. That Winnemucca tribal members were getting services here. Not many, but that they were, I didn't think you disputed that. We do not dispute that to Winnemucca tribal members receive services. I don't know what services they're getting. Only pursuant to the open door policy. So it, that doesn't convert this. You know, I think even Mr. Dos Santos agrees that just because a tribal member from a neighboring tribe walks in the door, that doesn't mean that the. And it seems like it's not that they didn't say it here. They didn't say it here and you're just disputing. You say it's just false. You'd never allocated shares for Winnemucca. That seems to be your argument. They said it's not that they didn't explain themselves. They said we have allocated shares in the amount of $190,000. For Winnemucca tribe. You're not allowed under the statute to take that. They've said that. So you're, you're seeking more than you're allowed. They said that. And you just say, it's just not true. Correct. That is our position. Sounds like a fact. Okay. Well, that's not the problem of their letter being insufficient. That's not like a factual dispute. Well, they have to, how are we supposed to resolve that? You're not resolving the factual dispute. What you're actually reviewing is did the agency, did the IHS clearly demonstrate these specific facts that they're putting at issue here? Did they clearly, They've got it there in document and your answer is untrue. I don't know what, I don't know. That's just sort of almost like a credibility thing. It's just, you're just not stating the truth. It's not that you didn't say enough. It's that it's false. And I don't know what more they were, how they were on notice that you were going to call their credibility into contention here. They were on, they were on notice for a number of reasons, but they did, they did mention their tribal shares argument, which we think their allocate, I'll call it an allocation argument. So they did mention that. I agree with you. And we think that that is legally incorrect. We think that is false, but what they also, Legally incorrect and false are not the same thing. How is it legally incorrect? We think both because we think the statute says it's not your budget. It's not your internal allocation that matters when a tribe comes in. Yeah. But the statute also says an awful lot about not taking other tribes shares. And it makes sense as a sort of concept of self-determination. So you got, you can't just look at one statutory provision. You got to read it as a whole. So that doesn't just saying pointing to one section doesn't tell me why they're legally wrong on the sections they cite. The provisions they're citing though, do not apply here. When we're talking about a tribal organization, which is what Mr. Dos Santos was referring to in 5304L, that's when a tribe designates another organization to contract on its behalf. It was relevant for the EMS program when the Fort McDermott tribe said, we're going to authorize Pyramid Lake to contract for that program. If Fort McDermott tribe had come in and said, we're going to authorize the Fort McDermott healthcare corporation LLC to contract. That's where that definition. Why does it have to be an outside tribe? Why couldn't it also be, this was a program that Interior was running for, to provide healthcare services to two tribes. And now one wants to take it over. What in those statutory provisions says that the requirement of consent to take over the allocable share, tribal share of another tribe, is not required? Or in the statute says that in this circumstance, instead of the third party one you're talking about. Right. Just let's be clear. You have to look at what is actually happening. Is IHS providing this for the benefit of multiple tribes? Let me give you the example that that would apply in. If Fort McDermott had come in and said, we want to contract for our clinic and we want to contract for the PRC program serving Winnemucca.  No, they said, we want to contract for this clinic. And IHS says, okay, thank you very much. This clinic is a two tribe clinic. But it's not a two tribe clinic. It never was a two tribe clinic. That's your factual dispute. Okay. All right. Right. Right. So that's our factual dispute. It's our factual dispute. But we also think that on the law that they have to provide what the secretary was providing for Fort McDermott. And so therefore what they were budgeting doesn't matter. You have to look at what they were expending. And that's the legal part of it. And what is that number? What is that number? The amount that they were expending. Is that the $600,000? That's the $600,000? The $600,000 plus the $500,000 for the EMS program. So it's a $1.1 million total. Okay. All right. Great. Any other questions? Okay. Thank you, Ms. Patterson. Mr. DeSantis, you were way over time, but you can have two minutes. Thank you. I'll just briefly state. You don't have to take a call. I have a question when, after you said something. There's one more question. Go ahead. I was just going to say that to the, it seems like the issue has been clarified to the extent that there's it's clear that IHS said it was budgeting an amount for the Winnemucca here. And then plaintiffs raise a factual dispute about whether or not, you know, that means it's a multi-track program and so forth. But. Is that the same as actual expenditure? Is that the same? I'm not sure what you mean, your honor. Doesn't the statute said, doesn't. I'm looking for the provision of the statute. Doesn't the statute says that under the contract, they get the amount that was expended in the previous year. It does not. It doesn't say that the statute says. The tribe gets the amount of money that the appropriate secretary. Would have otherwise provided. For the operation. Doesn't provided mean. What is provided me. So provided means. What the secretary was prospectively going to. Allocate in appropriate. Funds. To the program. The program, not for the tribe. To the. To the program. The tribe may in fact, only be able to take over a portion because it's not authorized to take over the whole. And then it would give the tribe. It's portion. It's tribal share. Who made the decision? Who made the decision to allocate? Tribal shares. For Winnemucca tribe. To this clinic. I just made the decision without consultation. With the tribe or just by interior itself. I just made the decision without consultation. The tribe didn't have a government. Okay. All right. And when did it make that decision? In 2013. Which. You could see the letter in J a one to 24. It has the initial letter saying. We've consulted with tribes in the region. And we've allocated tribal shares for the shirt service unit. And we've allocated tribal shares for the shirt service unit. Here are tables showing what each tribe is getting. So. My understanding is that that was the most recent. Round of consultation and allocation. What's the relationship. Between. The money. You say was allocated. To the Winnemucca as a budgeting matter. And the money that was allocated. For their tribal share. And. The money that was actually spent. To provide healthcare to the Winnemucca. Through this. Separate purchasing. Program. Is that part of the allocated share or is that something completely different? It's something completely different. When you're out. When you're. When you're. When you're doing the allocation of shares. Someone at IHS. Says we think the Winnemucca should have. Such and such amount allocated to them, but taking into account that. Most of their members are getting care. Through some separate bucket of funds. So IHS, you could see this in the tables. In the 2013 consultation. From day one to 24. IHS was allocating based on what it called active users. Which is number of potential users of healthcare services. Within the area. That's that's assigned to a particular tribe. And that's what we did.  And that's what we did. And it did that. For all the tribes. On the same basis. Came up with a number and then assign those programs. There is the assignment of this share to the clinic in this letter. Or these charts. As opposed to, I get, I get, they get this much money, but. Where are they assigning it to the clinic? The Fort McDermott clinic. I believe. You had to hold some of it. You had to hold a lot of, a lot of it back for their PRC, right? No, no. PRC is a separate pool of funding. Okay. All right. Okay. Really? Okay. Okay. I don't have a site for you. All right. I'm just trying to get the site. Thank you. You don't have the site right now. Sorry. Do you have the site? No. If you get this, if you get a site that says when you. Dedicated that to the former German clinic, I will be. Okay. Very helpful to have that. If that was part, maybe it was part of the 2013 letter. Okay. Anything else? Judgment. Okay. Thank you, Mr. So thank you both. Case. Submitted. Thank you.
judges: Tatel, Millett, Katsas